## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIANA BERNARDO | : |
| | :  CIVIL ACTION |
| Plaintiff, | : |
| v. | :  DOCKET NO.: |
| | : |
| RENAULT FBS, LLC; VIVAMEE | : |
| HOSPITALITY; ACCOUNTABLE | : |
| EQUITY, LLC; RENAULT WINERY | :  **JURY TRIAL DEMANDED** |
| RESORT & GOLF; RENAULT WINERY | : |
| PROPERTIES, LLC; RENAULT | : |
| WINERY, INC.; RENAULT GOLF, LLC; | : |
| RENAULT GALLOWAY RE, LLC; | : |
| RENAULT EGG HARBOR TOWNSHIP | : |
| RE, LLC; RENAULT GC HOLDINGS, | : |
| LLC; RENAULT PROPERTIES, LLC; | : |
| RENAULT HOLDINGS, LLC | : |
| | : |
| Defendants. | : |

## CIVIL ACTION COMPLAINT

Diane Bernardo (*hereinafter* referred to as "Plaintiff," unless indicated otherwise), by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      This action has been initiated by Plaintiff against Renault FBS, LLC, Vivamee Hospitality, Accountable Equity, LLC, Renault Winery Resort & Golf, Renault Winery Properties, LLC, Renault Winery, Inc., Renault Golf, LLC, Renault Galloway RE, LLC, Renault Egg Harbor Township RE, LLC, Renault GC Holdings, LLC, Renault Properties, LLC, and Renault Holdings, LLC (*hereinafter* collectively referred to as "Defendants") for violations of the New Jersey Conscientious Employee Protection Act ("CEPA" – N.J.S.A. §§ 34:19-1, *et seq*.), the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101 *et. seq*.),[1] and the New Jersey Law

---

[1] Plaintiff intends to amend her complaint to include retaliation claims under the ADA once her claims have been administratively exhausted with the Equal Employment Opportunity Commission ("EEOC") and the EEOC issues a right-to-sue letter.

Against Discrimination ("NJ LAD").  Plaintiff asserts she was terminated from her employment with Defendants for retaliatory reasons. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      Plaintiff resides in and is a citizen of Pennsylvania.

3.      Renault FBS, LLC, Vivamee Hospitality, Accountable Equity, LLC, Renault Winery Resort & Golf, Renault Winery Properties, LLC, Renault Winery, Inc., Renault Golf, LLC, Renault Galloway RE, LLC, Renault Egg Harbor Township RE, LLC, Renault GC Holdings, LLC, Renault Properties, LLC, and Renault Holdings, LLC are incorporated under the laws of New Jersey with headquarters and/or principal places of business in same, rendering them citizens of New Jersey.

4.      The United States District Court for the District of New Jersey has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship, as Plaintiff is a citizen of Pennsylvania, Defendants are citizens of New Jersey, and the amount in controversy exceeds $75,000.

5.      This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny.

6.      Venue is properly laid in this District pursuant to 28 U.S.C. sections 1391(b)(1) and (b)(2), because Plaintiff worked for Defendants in New Jersey, *all actions underlying this case occurred in New Jersey*, and because Defendants' principal places of business are in New Jersey.

## **PARTIES**

7.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

8.      Plaintiff is an adult individual with an address of 1702 S. 5th Avenue, Lebanon, Pennsylvania 17042.

9.      Upon information and belief, Renault FBS, LLC, Vivamee Hospitality, Accountable Equity, LLC, Renault Winery Resort & Golf, Renault Winery Properties, LLC, Renault Winery, Inc., Renault Golf, LLC, Renault Galloway RE, LLC, Renault Egg Harbor Township RE, LLC, Renault GC Holdings, LLC, Renault Properties, LLC, and Renault Holdings, LLC are registered corporate entities with the New Jersey Department of State.

10.      Plaintiff was hired directly by Vivamee Hospitality and the Renault Winery Resort & Golf as a Director of Hospitality Operations.  However, Plaintiff received payroll and a W-2 (for taxation purposes) directly from Defendant Renault FBS, LLC, but was *functionally and legally* an employee of all Defendants.  By way of example only:

   a.  Defendants operate as a single enterprise;

   b.  Defendants transfer employees and management amongst the different entities and share staff and employees amongst same, doing business under many business names;

   c.  Defendants utilize overlapping documents, policies, and information amongst each entity; and

   d.  Defendants share employees, resources, have the same owner(s) and high-level management, share financial controls, follow the same directives, use the same employment documents within the enterprise regardless of Defendant, have the same procedures and benefits for the entire enterprise of all Defendants, and merely operate as a single business under the aforesaid different business names.

11.      Upon information and belief, one of the locations in which Defendants collectively operate from (and is listed as the address for Plaintiff's employer on her W-2 form and paystubs)

3

is 72 North Bremen Avenue, Egg Harbor City, New Jersey 08215.  Plaintiff was hired through and worked out of this address.

12.     At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendants.

**FACTUAL BACKGROUND**

13.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

14.     Plaintiff was hired by Defendants on or about February 26, 2020, as the Director of Hospitality Operations for Defendants' Renault Winery Resort & Golf facility (including the onsite "Chateau Renault" Hotel) located at 72 North Bremen Avenue, Egg Harbor City, New Jersey 08215.

15.     Upon Plaintiff's information and belief, Defendants are owned/operated by Josh McCallen (*hereinafter* "JM") and his wife Melanie McCallen (*hereinafte*r "MM").

16.     Plaintiff has over 30 years' experience in the hospitality industries, including but not limited to opening five hotels, three new buildings, and overseeing the renovations of at least two buildings.

17.     Upon Plaintiff's information and belief, she was hired because of her extensive experience with branded hotels including those under the Hilton umbrella.     Specifically, Defendants wanted Plaintiff to model their properties under the Vivamee Hospitality brand, starting with the Renault Winery (*hereinafter* "the Winery") and Chateau Renault Hotel (*hereinafter* "the Hotel"), after Hilton "gold standards and procedures," under the direction of JM.

18.     Shortly after Plaintiff's hire in February of 2020, as a result of the COVID-19 pandemic, Plaintiff was laid off from her position with Defendants.

4

19.     In or about the third week of April of 2020, Plaintiff returned to work for Defendants on a part-time basis of 8 hours per week; however, the work that Defendants expected Plaintiff to perform far exceeded the 8 hours she was permitted to work per week.  As a result, she emailed JM that she needed full-time work with Defendants or she would be required to look for employment elsewhere.

20.     On or about May 19, 2020, Plaintiff attended a conference call with JM, MM, Human Resources ("HR") Manager, Brian Jones (*hereinafter* "Jones") and Vice President & Chief Operating Officer ("COO") of Defendant Vivamee Hospitality, Dan Alicea (*hereinafter* "Alicea"), wherein Defendants' management praised Plaintiff for her talents and begged her to stay on-board.

21.     As a result of the aforesaid May 19, 2020 conference call, Plaintiff was offered her full-time position back at a reduced salary, plus a sign on bonus of $10,000.00; however, before accepting Defendants' employment offer, Plaintiff specifically texted Jones to confirm that if she was laid-off from employment with Defendants again, she would not be required to repay the $10,000 sign-on bonus.  Jones responded to Plaintiff's text, confirming that she would only be required to repay the sign on bonus if she *voluntarily* left her employment with Defendants.

22.     Thereafter, Plaintiff agreed to stay on premises at the Winery and Hotel, while overseeing renovations and the reopening, as she lived out of state and several hours away. However, when Plaintiff arrived at the Hotel on or about May 25, 2020 to be begin working, she was immediately alarmed at the multitude of local, state, and federal safety and building/construction regulation violations that Defendants were committing.  By way of example, but not intended to be an exhaustive list, Plaintiff observed the following:

      a.   A non-functioning fire alarm system (despite the General Managers assertions to the contrary) and other fire code issues;

      b.   No safety locks on hotel room doors, permitting anyone to enter;

    c.   Master keys for all rooms in the hands of maintenance crew;

    d.   Padlocks on the front door; and

    e.   The Emergency exits were blocked and inaccessible.

23.    After spending two nights at the hotel and feeling very unsafe being the only woman on the premises, Plaintiff contacted Alicea on or about May 27, 2020, and questioned the legality from an insurance perspective of having employees stay onsite before the hotel was open and compliant with all local, state, and federal building and safety regulations.

24.    In response to Plaintiff's aforesaid inquiry of the safety and insurance implications of having guests at the hotel before it was open (*see* Paragraph 23, *supra*), Alicea stated "between you and me, I don't think anyone should stay here," and he did not believe McCallen should have family members staying there as well because the Hotel "wasn't ready."

25.    Alicea further advised Plaintiff during their May 27, 2020 phone call, "Why don't you pick one day a week and work the rest from home.  It doesn't have to be the same day every week, just make sure [the GM] is here and just come once a week and make sure everyone is doing what they should be doing."  Thereafter, Plaintiff began to work from home a few days per week because of her safety concerns.

26.    On or about June 4, 2020, during a weekly Zoom Leadership Meeting, Alicea and McCallan called Plaintiff a "Rockstar," as a result of work that she was accomplishing with the Hotel renovations and branding.

27.    As Plaintiff continued to monitor and direct the Hotel renovations; however, she began to observe what she believed to be several violations of the Americans with Disabilities Act ("ADA") accessibility standards, as well as discriminatory public accommodation practices under the NJ LAD.

28.     What Plaintiff was experiencing was highly disturbing (with respect to legality, safety, and ADA accessibility for guests).  Because of Plaintiff's extensive experience in the field, she was aware that all newly designed and constructed or altered public accommodations and commercial facilities need to be readily accessible to and usable by individuals with disabilities, pursuant to Title III of the ADA, which includes the 2010 Standards for Accessible Design (hereinafter the "ADA Standards") and the 2004 ADA Guidelines for Accessible Design ("ADAAG") (28 C.F.R. § 36.101 et seq.).

29.     Because Defendants renovated 100% of their guest rooms, complete and total renovations, down to "bare bones," Plaintiff knew that the amount of ADA accessibility design accommodations was significant, and the regulations were not being followed.

30.     Plaintiff reached out to Defendants' management, including but not limited to JM, MM, and Alicea, on several occasions throughout her tenure with Defendants via email and during weekly Zoom meetings to express her concerns that Defendants were engaging in federal ADA accessibility regulation violations,  and they needed to be addressed prior to the projected Hotel opening date of June 29, 2020.   By way of example, but not intended to be an exhaustive list, Plaintiff identified the following "punch list" of items that were in violation of the ADA accessibility regulations in Defendants' purported ADA designated rooms:

    a.  Peepholes not at ADA designated eye levels or none at all;

    b.  Safety latches not at ADA accessibility levels;

    c.  Missing grab bars in bathrooms;

    d.  Contained closed bed frames instead of open bed frames required for ADA accessibility;

    e.  Improper toilet seat height;

    f.  No wheelchair accessible or roll-in showers;

    g.  No mechanical lift in place at the pools;

h.  Cabinets in kitchen suites not at ADA accessibility heights;

i.  Kitchen island not at ADA accessibility heights;

j.  Not enough clearance around the beds in ADA designated rooms;

k.  No ADA wands for blinds/draperies;

l.  Bathroom sinks did not have open clearance underneath and/or pipes under sinks were not insulated;

m.   There were zero hearing impaired rooms in the Hotel and there was no TTY at the front desk as required under the ADA for guests with hearing disabilities;

n.  The rooms were not evenly distributed among room types (no ADA accessible queen rooms; no ADA accessible bridal suites);

o.  ADA compliant Braille room signage had not been ordered yet, and no Braille signage had been in place when there were guests staying in the hotel; and

p.  No ADA exit or other signage.  Specifically, a representative from the sign company informed Plaintiff that Alicea and JM did not want ADA signage because it "ruined the aesthetic."  Defendants' management explicitly advised Plaintiff to order signage that was not ADA complaint for the ballrooms, thus requiring Plaintiff to violate ADA regulations.[2]

31.   In addition to the aforesaid ADA accessibility regulation violations, Plaintiff opposed other illegal practices of Defendants and/or expressed concerns of such legality in matters as follows:

a.  Very serious Occupational Safety and Health Administration ("OSHA")/ Department of Labor ("DOL") violations, such as no fire panel at the front desk – upon Plaintiff's information, belief, and prior experience, the fire panel should be visible to front desk Hotel agents; however, in this instance the panel was located some several hundred feet away and not visible by the front desk agents. Defendants' General Manager informed Plaintiff that they had "gotten a quote for an upgrade but it was too much money."  When Plaintiff asked Alicea if the Fire Marshall had signed off on the panel, her concerns were dismissed;

b.  Defendants had no Safety Data Sheet ("SDS") Book or Hazard Communication, which upon Plaintiff's information, belief, and experience is an OSHA safety regulation violation;

---

[2] Upon Plaintiff's information and belief, after her termination, Defendants later agreed to the signage after a lawsuit was filed against them for having a website that was not complaint with the ADA.

    c.   Flammables were not kept in a proper flammable cabinet, and chemicals were not kept in properly labeled bottles.  Upon Plaintiff's information, belief, and experience, an SDS is required for every chemical used on the property.  Plaintiff instructed Defendants to get the SDS directly from the vendor they purchased the chemicals from and have someone on property maintain the book, but her concerns were ignored;

    d.   The areas around the electrical panels were not kept clear;

    e.   Construction crew members were cooking in the rooms and in the small room off the Hotel balcony which had no ventilation.  When Plaintiff reported this as a fire safety issue to MM she flippantly told Plaintiff she "appreciated their [construction crew members] resourcefulness" but ignored her concerns;

    f.   Construction workers were not wearing masks while working during the COVID-19 pandemic.  Plaintiff contacted the local permit office, determined that they were required, and informed the workers they needed to wear masks.  Another employee then told Plaintiff not to speak to the construction crew, that Alicea said he would take care of it, and that Defendants were ***"doing a lot of illegal stuff" and did not have all of the required permits for the work***; and

    g.   Personal Protective Equipment ("PPE") was not available to staff during construction (i.e. goggles, masks for dust inhalation, etc.) nor was it available on an everyday basis and construction workers were not wearing PPE (i.e. hard hats, masks, etc.).

32.    Despite complaining to Defendants' owners and management on multiple occasions about the aforesaid ADA accessibility, health, safety, building code regulations, discriminatory public accommodation practices under state law, and concerns of illegality for several months, Defendants' owners and management disregarded her concerns, expected her to go along with or turn a blind eye to their illegal practices (discussed *supra*) or cavalierly dismissed the acknowledged illegality of their actions, stating "we don't need to be inspected because we were never technically closed," and "no one ADA will be coming through here to inspect things."

33.    Following Plaintiff's complaints of/objections to the aforesaid illegal practices of Defendants, she experienced very negative and/or hostile treatment from JM, including being subjected unfounded concerns about her performance and leadership capabilities.

34.     Plaintiff was then terminated on or about June 17, 2020, by Jones who informed Plaintiff that: (1) JM wanted to "part ways"; (2) her position was being eliminated; and (3) JM felt she "showed lack of leadership."

35.     While working for Defendants, Plaintiff came to realize that Defendants operated their business unlawfully on a sustained and continued basis.  Such information came to Plaintiff through her own research, her own observations, directives she was given, and through interactions with coworkers and management.

36.     Defendants engaged in numerous local, state and federal violations of regulations and crimes (directly, by way of conspiracy, and through acquiescence and/or ratification of such known unlawful conduct).  Solely by way of notice herein and by way of examples (in a non-exhaustive list), such legal violations included but were not limited to:

      a.  Violations of the Americans with Disabilities Act ("ADA") Standards for Accessible Design (28 C.F.R. § 36.101 et seq.);

      b.  Occupational Health and Safety Administration ("OSHA")/Department of Labor ("DOL") violations;

      c.  The New Jersey Law Against Discrimination (NJ LAD);

      d.  The New Jersey Hotel and Multiple Dwelling Law (N.J.S.A. § 55:13A-1 et seq.);

      e.  The New Jersey Uniform Construction Code (N.J.A.C. § 5:23-1.1 et seq.); and

      f.  Many other local, state and federal construction, building code, safety, and permit regulations.

37.     Plaintiff merely provides examples *supra* of factual and legal violations of regulations and laws, as much of what Plaintiff was required and directed to do during her employment was illegal and/or criminal.  *See, e.g.*, *Durst v. FedEx Exp.*, No. 03–CV–5186 (JBS), 2005 WL 3534179, at *5 (D.N.J. 2005) (a plaintiff asserting a CEPA claim is not even required to

cite to any laws for his or her reasonable belief of a legal violation during litigation; but rather, to set forth a communicated belief of something that was believed to be unlawful).[3]

38.     Plaintiff was terminated shortly after making numerous complaints to Defendants' owners/management illegal violations of several regulations and laws (as set forth *supra*), for what she reasonably believes to be pretextual reasons.   In actuality, Plaintiff was terminated specifically because of her opposition to illegal practices of Defendants, her refusal to commit unlawful acts, and in retaliation for advocating, aiding, or encouraging individuals with disabilities in the exercise of their rights under the NJ LAD.

**COUNT I**
**Violations of the New Jersey Conscientious Employee Protection Act ("CEPA")**
**(Wrongful Termination - Retaliation)**
**-Against All Defendants-**

39.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

40.     Plaintiff was terminated for several instances of engaging in protected activity by making complaints and/or for objecting to unlawful actions in the workplace as outlined in significant detail in this Complaint.

41.     These actions as aforesaid constitute violations of CEPA.

**COUNT II**
**Violations of the New Jersey Law Against Discrimination ("NJ LAD")**
**(Wrongful Termination - Retaliation)**
**-Against All Defendants-**

42.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

---

[3] New Jersey's CEPA statute "has been described as the most far reaching 'whistleblowing statute' in the nation." Bowen v. Parking Auth. of City of Camden, No. CIV. 00-5765 (JBS), 2003 WL 22145814, at *16 (D.N.J. 2003).

43.     Throughout Plaintiff's tenure with Defendants she observed what she believed to be several violations of state and federal accessibility and public accommodation regulations for individuals with disabilities (discussed *supra*).

44.     Pursuant to the NJ LAD, it is unlawful for "for any owner . . . proprietor, manager, or . . .  employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, on account of … disability."  N.J. Stat. § 10:5-12 (f)(1).

45.     Plaintiff reached out to Defendants' management, on several occasions throughout her tenure with Defendants via email and during weekly Zoom meetings to express her concerns that Defendants were engaging in federal and state accessibility regulation violations, and refusing to provide the required state and federal public accommodations for individuals with disabilities.

46.     Despite complaining to Defendants' owners and management on multiple occasions about the aforesaid accessibility and public accommodation violations and concerns of illegality for several months, Defendants' owners and management disregarded her concerns, expected her to go along with or turn a blind eye to their illegal practices or simply dismissed the acknowledged illegality of their actions, stating "we don't need to be inspected because we were never technically closed," and "no one ADA will be coming through here to inspect things."

47.     Instead, Plaintiff was abruptly terminated for pretextual reasons on or about June 17, 2020, just one week after her most recent email complaint to Defendants' owners and management regarding their refusal to provide the required state and federal public accommodations for individuals with disabilities.

48.     Plaintiff believes and therefore avers that she was terminated from her employment with Defendants for protected activity – "aid[ing] or encourag[ing]" individuals with disabilities

"in the exercise or enjoyment of, [their] right[s] granted or protected" under the NJ LAD (i.e. accessibility to public accommodations and commercial facilities).  *See* N.J. Stat. § 10:5-12(d).

49.     These actions constitute unlawful retaliation under the NJ LAD.

**COUNT III**
**Violations of the New Jersey Law Against Discrimination ("NJ LAD")**
**(Post-Termination Retaliation)**
**-Against All Defendants-**

50.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

51.     On or about May 19, 2020, Plaintiff was offered her full-time position back (after a brief lay-off due to the COVID-19 pandemic) at a reduced salary, plus a sign on bonus of $10,000.00; however, before accepting Defendants' employment offer, Plaintiff specifically texted Jones to confirm that if she was laid-off from employment with Defendants again, she would not be required to repay the $10,000 sign-on bonus.  Jones responded to Plaintiff's text, confirming that she would only be required to repay the sign on bonus if she *voluntarily* left her employment with Defendants.

52.     Plaintiff was abruptly terminated from her employment with Defendants on or about June 17, 2020, as a result of her numerous complaints to Defendants' owners/management regarding illegal violations of several regulations and laws, including those for the protection of individuals with disabilities, and "having aided or encouraged" individuals with disabilities "in the exercise or enjoyment of, [their] right[s] granted or protected" by the NJ LAD.   *See* N.J. Stat. § 10:5-12(d).

53.     Over one month following her termination, Plaintiff received a letter from Defendants seeking repayment of her sign-on bonus for the "unamortized amount of $5,549.42" with the threat of legal action to enforce same – despite the fact that Jones had informed Plaintiff

via text that Defendants would only demand repayment of the sign-on bonus if she *voluntarily* left her employment with Defendants.

54.     Defendants sought repayment of Plaintiff's sign-on bonus after she made several complaints of Defendants' illegal practices and violations of several regulations and laws, including those for the protection of individuals with disabilities and having advocated for same in the exercise or enjoyment of their rights as provided under the NJ LAD (i.e. accessibility to public accommodations and commercial facilities).

55.     These actions as aforesaid constitute unlawful retaliation under the NJ LAD.[4]

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B.     Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

C.     Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress/pain and suffering);

---

[4] *Roa v. Roa,* 985 A.2d 1225, 1228 (2010) (holding that under the NJ LAD, a discrete post-discharge act of retaliation is independently actionable even if it does not relate to present or future employment, and evidence relating to barred claims may be admissible in the trial of the timely claim.)

D.    Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

E.    Plaintiff is to be given a trial by jury.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____

Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: August 25, 2020